MilligaN, .J.,
delivered .the opinion of the Court.
This is an action commenced by warrant, before a Justice of the Peace of Cannon County, to recover the price of a rifle gun, which, it is alleged in the warrant, was taken and converted to the use of the plaintiff in error. There was judgment, before the Justice, in favor of the defendant in error, and an appeal to the Circuit Court of Cannon County, when, 'on a trial before a jury, the Justice’s judgment was affirmed, and an appeal in error prosecuted to this Court.
It appears from the record, that one B. J. Hill, through the agency of G-overnor Harris, obtained permission of the rebel Secretary of War, to raise and equip a regiment of infantry, to serve in the army of the “Confederate States,” for one year; and that at the time the rifle gun in controversy was purchased, the plaintiff in error was a Captain, commanding a rebel company in Hill’s regiment, and that the gun was obtained for the purpose of arming his company. The contract appears to have been made about the 5th of September, 1861, within this State, and during the time it was held and occupied by the military forces *371 of the “Confederate States.” It was voluntarily made, and with full knowledge, on the part of the defendant in error, of the purpose for which the gun was purchased, and the service in which it was to be employed.
Under this state of facts, the Circuit Judge instructed the jury, among other things, which appears not to be excepted’ to, as follows: “If you should believe, from the proof, that the plaintiff sold the defendant his rifled gun, knowing at the time it was to be used in the Confederate or Rebel Army, and you should further believe, from the proof, that at the time of the sale, this country, where both parties were living, was in the possession and under the control of the military authorities of the so-called “Confederate States/’ they having been recognized a belligerent power by the Government of the United States, and holding military occupation of the country where the contract was made, at the time it was made, then, under such a state of facts, if they exist, the plaintiff would be entitled to recover from the defendant whatever the proof may show the gun was worth at the time of the contract, all other questions being out of the way.”
The facts of this case are remarkably strong. Open war, at the date of this contract, was being waged, by an unlawful combination of the insurgent States, to overthrow the Government and authority of the United States, within their limits. The State of Tennessee had declared its independence, and by an ordinance of its Legislature, assumed to dissolve the Federal relations between the State and the United States of *372 America. War was actually levied, and flagrant, against the laws, Constitution and Government of the United States. The President had called upon “the several States of the Union," (Tennessee included,) for the militia to the aggregate amount of 75,000, to suppress the unlawful combination that was making war against the Government, and to cause the laws thereof to be duly executed. The insurgents had been warned by his Proclamation to disperse and retire peaceably to their respect abodes, and within less than one month before this transaction, the State of Tennessee, by Executive Proclamation, had been formally declared in insurrection, and all intercourse between her citizens and the citizens of the loyal States, prohibited. With these facts fully within the knowledge of the defendant in error, he entered, with his eyes open, into this contract; and now, after the war 'is over, and the authority and laws of the Government of the United States restored to the people of Tennessee, he deliberately asks the Courts of the country to enforce his contract. Can it be done? The war is over, and peace has again been restored, and this Court certainly has no desire to revive the unpleasant memories of the past, but we are compelled to recognize the law as it exists. Contracts, it is veil settled, are illegal, when founded on a consideration contra tonas mores, or against the principles of sound policy, or founded in fiaud, or in contravention of the positive provisions of law: 2 Kent’s Com., 598, and note , with authorities there cited.
This principle has been repeatedly, recognized in vari *373 ous decisions of this Court, and of the Supreme Court of the United States: See Yerger vs. Rains, 4 Hump., 259; Allen vs. Dodd, 4 Hum., 132; Pulse vs. the State, 5 Hum., 108.
In the case of Craig vs. the State of Missouri, 4 Peters, 116, Chief Justice Marshall, in delivering the opinion of the Court, said: “It has been long settled, that a promise made in consideration of an act which is forbidden by law, is void. It will not be questioned, that an act forbidden by the Constitution of the United States, which is the supreme law, is against law.”
This contract, although perhaps not malum in see, was made against the settled public policy of the Government of the United States, and against the laws and Constitution. It was not made with a mere private individual, but with an officer and agent of the Confederate States, and with a view of aiding and assisting the rebellion then in active progress. The case of Bennett vs. Chambers, 14 Howard, 38, is in point, and if authority was required, decisive of this case. There the contract was to assist a Texan officer, in the war with Mexico, before the recognition of Texas by the United States, and the Court held the contract illegal. Much more are we, therefore, bound to hold the contract illegal, and to repel the plaintiff below from the Courts of the country, because it was against the public policy, laws and authority of the lawful Government, to which the plaintiff in error rightfully owed allegiance.
But the Circuit Judge seemed to think, and it is so insisted here, that, inasmuch as the “Confederate *374 States” had been recognized as a belligerent power,' that would legalize all their transactions with third persons, and justify the Courts of the country in enforcing them. We do not think so. It is conceded that the Supreme Court of the United States, in what is known as the Prize Oases, held the late war with the “Confederate States,” to be a “civil war” and the parties entitled to all the rights of belligerents; and that the commanding military officers of the armies of the United States, with the sanction of the President, properly conducted the war upon all the usages, maxims and laws of war, which have been established among enlightened and Christian nations, to mitigate its horrors; but whether a recognition of the “Confederate States” as a belligerent power, to make it effectual, has not to be evidenced by the official action of the Legislative and Executive Departments of the G-overnment, is a question that we do not feel called upon to express any opinion. It is sufficient for the determination of this case, in any aspect of the question of belligerent rights, to say, that we cannot assent to the ruling of the Circuit Judge.
The rights of a power merely belligerent, is to demand the fair and reasonable application of the laws of war, in the conduct of the war in which such power may be engaged. They may, in some instances, affect neutrals, and other powers, who, in their discretion, saw proper to recognize such power as a belligerent, and as such to hold intercourse with it; but they cannot, in case of a revolt, be so extended as to embrace private contracts with individual citizens, *375 whose rightful allegiance is due to the metropolitan government, and thereby include that which would otherwise be illegal and void, .valid and capable of being enforced in a Court of Justice. A contrary construction of the rights of a power merely belligerent, would be substantially to confer upon it all the powers belonging to an organized, sovereign and independent nation, which we are not prepared to yield to the late “Confederate States.”
The judgment of the Circuit Judge will be.reversed, and a new trial awarded; when the law will be charged in conformity to this opinion.